# United States Tax Court

REVIEWED
165 T.C. No. 3

SILVER MOSS PROPERTIES, LLC, SILAS MINE INVESTMENTS,
LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 10646-21.                          Filed August 21, 2025.

_____

A partnership subject to the audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, donated a conservation easement and claimed a charitable contribution deduction under I.R.C. § 170. P, the tax matters partner, timely petitioned this Court challenging the IRS's Notice of Final Partnership Administrative Adjustment. R later amended his Answer to assert a civil fraud penalty against the partnership under I.R.C. § 6663(a).

P filed a Motion for Partial Summary Judgment, citing *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), and contending that this Court is barred from adjudicating the civil fraud penalty because U.S. Const. amend. VII guarantees a right to trial by jury in such actions, which is not an option in this Court.

*Held*: U.S. Const. amend. VII does not apply to suits against the sovereign, and Congress has not otherwise consented to trial by jury in TEFRA partnership-level actions.

**Served 08/21/25**

*Held, further*, the "public rights" exception to U.S. Const. amend. VII applies to a civil fraud penalty under I.R.C. § 6663(a).

*Held, further*, this Court may adjudicate an I.R.C. § 6663(a) civil fraud penalty.

PUGH, *J.*, wrote the opinion of the Court, which URDA, *C.J.*, and KERRIGAN, BUCH, NEGA, ASHFORD, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ.*, joined.

————————

*Michelle Abroms Levin*, *Gregory P. Rhodes*, *Ronald A. Levitt*, *Sidney W. Jackson IV*, *Logan C. Abernathy*, *Sarah E. Green*, *Emily C. Ellis*, and *Olla F. Jaraysi*, for petitioner.[1]

*Richard J. Hassebrock*, *Kerrington A. Hall*, *Heather K. McCluskey*, *Jeffrey L. Heinkel*, *Andrew Yamanaka Belter*, *Matthew T. James*, *Parker M. LeMieux*, *Justyna W. Jozwik*, and *Mayer Y. Silber*, for respondent.

OPINION

PUGH, *Judge*: This case is a partnership-level proceeding under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71.[2] It is one of several related but not consolidated cases in which a party challenges the Internal Revenue Service's (IRS) disallowance of a deduction for a conservation easement donation.[3] In a Motion for Partial Summary Judgment,

---

[1] Brief amicus curiae was filed by *Andrew Weiner*, *Michael Todd Welty*, and *Gray Proctor* as attorneys for the Center for Taxpayer Rights.

[2] TEFRA was repealed by the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625.

[3] The conservation easements at issue in all of these cases came from subdivided parcels of the same property. *See McKinley Brooks, LLC v. Commissioner*, No. 26125-21 (T.C. filed Oct. 13, 2021); *Sydney Roads, LLC v. Commissioner*, No. 30287-21 (T.C. filed Nov. 11, 2021); *Joint Star Properties, LLC v. Commissioner*, No. 30289-21 (T.C. filed Nov. 11, 2021); *Econfina Resources, LLC v. Commissioner*, No. 12980-22 (T.C. filed June 9, 2022); and *Jackson Pines, LLC v. Commissioner*, No. 6800-23 (T.C. filed May 3, 2023).

petitioner contends that this Court is barred from adjudicating a section 6663(a)[4] fraud penalty by the Seventh Amendment to the U.S. Constitution. For the reasons discussed below, we disagree.

*Background*

The following facts are derived from the parties' filings to date. They are stated solely for the purpose of ruling on the Motion before us and not as findings of fact in this case. *See Rowen v. Commissioner*, 156 T.C. 101, 103 (2021) (reviewed). The principal place of business of Silver Moss Properties, LLC (Silver Moss), was in Mississippi when petitioner filed its Petition with this Court. *See* § 7482(b)(1)(E).

In 2017 Silver Moss acquired land in Taylor County, Florida. It donated a conservation easement on that land to Atlantic Coast Conservancy, Inc., and claimed a charitable contribution deduction under section 170 on its partnership return. Respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA), in large part disallowing the deduction attributable to the easement.

Petitioner alleged in its Petition that respondent erred in his determination that the charitable contribution did not satisfy all of the requirements of section 170. Respondent timely filed an Answer, which we later permitted him to amend to assert the section 6663(a) fraud penalty.

Petitioner then filed a Motion for Partial Summary Judgment, citing *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), for the proposition that the section 6663(a) fraud penalty asserted against Silver Moss cannot apply as a matter of law. Petitioner urges that "a court cannot adjudicate a common law fraud penalty, like that of [section] 6663, without providing an opportunity for a trial by a jury." Respondent counters that the United States has not waived sovereign immunity and that the penalty proceeding falls within the "public rights" exception to the Seventh Amendment's right to trial by jury.

---

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

*Discussion*

I.    *Summary judgment standard*

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 121(a)(2). In deciding whether to grant summary judgment, we consider factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

II.   *Sovereign immunity*

Under TEFRA the IRS could initiate proceedings at the partnership level to adjust partnership items. *See* §§ 6221, 6231(a)(3). Partnerships could challenge the resulting FPAA in this Court, the U.S. Court of Federal Claims, or a U.S. district court having jurisdiction. § 6226(a).[5] While section 6226 permitted TEFRA partnerships to seek judicial review of an FPAA, including the applicability of penalties,[6] it did not confer a right to a jury trial.

It is well settled that there is no right or mechanism to a trial by jury in either this Court or the Court of Federal Claims.[7] *See Mathes v. Commissioner*, 576 F.2d 70, 71–72 (5th Cir. 1978) (per curiam)

---

[5] Section 6226(f) granted "jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the [FPAA] relates, . . . and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item." This Court's jurisdiction, once acquired, extended to all partnership items for the taxable year. *See Wilmington Partners L.P. v. Commissioner*, T.C. Memo. 2009-193, 2009 WL 2612305, at *3–5.

[6] The IRS could assess a penalty imposed at the partnership level without issuing a Notice of Deficiency to the partners. § 6230(a)(2)(A)(i); Treas. Reg. § 301.6231(a)(6)-1(a)(3). An individual partner could challenge that penalty through a refund action in district court or the Court of Federal Claims; however, the partner generally could raise only partner-level defenses and could not relitigate determinations of partnership items. § 6230(c)(4).

[7] The U.S. Court of Appeals for the Eleventh Circuit recently denied two writs of mandamus that sought to compel this Court to empanel juries for the adjudication of section 6663(a) fraud penalties. *In re Hirsch*, Nos. 25-10420, et al., slip op. at 3 (11th Cir. May 30, 2025), *denying mandamus to Hirsch v. Commissioner*, Nos. 28898-10, et al. (T.C. filed Dec. 27, 2010).

("[A] taxpayer who elects to bring his suit in the Tax Court has no right, statutory or constitutional, to a trial by jury." (first citing *Phillips v. Commissioner*, 283 U.S. 589, 599 n.9 (1931); then citing *Wickwire v. Reinecke*, 275 U.S. 101, 105–06 (1927); and then citing *Dorl v. Commissioner*, 507 F.2d 406, 407 (2d Cir. 1974) (per curiam), *aff'g* T.C. Memo. 1973-145)), *aff'g* T.C. Memo. 1977-220; *Swanson v. Commissioner*, 65 T.C. 1180, 1181–82 (1976); *Rohland v. United States*, 135 Fed. Cl. 36, 38 (2017).

Title 28 U.S.C. § 1346 outlines when the district courts and the Court of Federal Claims have jurisdiction over a claim against the United States, including tax refund suits, 28 U.S.C. § 1346(a)(1), and TEFRA partnership-level proceedings, 28 U.S.C. § 1346(e). In turn, 28 U.S.C. § 2402 limits the availability of jury trials in actions brought under 28 U.S.C. § 1346: "[A]ny action against the United States under section 1346 shall be tried by the court without a jury, except that any action . . . under section 1346(a)(1) shall, at the request of either party to such action, be tried by the court with a jury." A partnership-level TEFRA action would be brought in district court pursuant to 28 U.S.C. § 1346(e), not the general refund provisions of 28 U.S.C. § 1346(a)(1). Thus, a jury trial is not available in district court for TEFRA partnership-level actions either.[8]

The United States, as sovereign, is immune from suit unless it consents to be sued, and the terms of its consent to be sued in a court define that court's jurisdiction. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "It has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *see Rowlee v. Commissioner*, 80 T.C. 1111, 1115 (1983). This is true even where the federal government later asserts a counterclaim that would otherwise implicate the Seventh Amendment:

> Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defen[s]e, or to any set-off, or counter-claim which the government may assert, are not controlled by the Seventh Amendment. *They are not suits at common law within its*

[8] The unavailability of jury trials in TEFRA partnership-level actions is the exception, not the rule. Taxpayers ordinarily are afforded the choice of a jury trial in district court refund suits. 28 U.S.C. § 1346(a)(1). But this exception was maintained in the replacement to TEFRA; the BBA audit and litigation regime similarly does not provide a right to trial by jury in partnership-level proceedings. 28 U.S.C. § 2402.

*true meaning. The government cannot be sued, except with its own consent.* . . . It may restrict the jurisdiction of the court to a consideration of only certain classes of claims against the United States. Congress, by the act in question, *informs the claimant that if he avails himself of the privilege of suing the government in the special court organized for that purpose, he may be met with a set-off, counter-claim, or other demand of the government, upon which judgment may go against him, without the intervention of a jury*, if the court, upon the whole case, is of opinion that the government is entitled to such judgment. *If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by the government to the exercise of the privilege.* Nothing more need be said on this subject.

*McElrath v. United States*, 102 U.S. 426, 440 (1880) (emphasis added).

Because "controversies to which the United States may by statute be made a party defendant, at least as a general rule, lie wholly outside the scope of the judicial power vested by Art. III in the constitutional courts," *Williams v. United States*, 289 U.S. 553, 577 (1933), the Seventh Amendment does not apply. While Congress has exercised a limited waiver of sovereign immunity as to judicial review in TEFRA partnership-level actions, it has not assented to trial by jury in district court, nor has it enabled this Court or the Court of Federal Claims to empanel juries. Petitioner therefore is not entitled to a jury trial as to the section 6663(a) fraud penalty.

Justice Scalia's explanation of the interplay between sovereign immunity and the "public rights" exception, which we address next, confirms that sovereign immunity is integral to our analysis:

It is clear that what we meant by public rights were not rights important to the public, or rights created by the public, but rights *of the public*—that is, rights pertaining to claims brought by or against the United States. For central to our reasoning was the device of waiver of sovereign immunity, as a means of converting a subject which, though its resolution involved a "judicial act," could not be brought before the courts, into the stuff of an Article III "judicial controversy."

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 68 (1989) (Scalia, J., concurring in part and concurring in the judgment).

III.   *Public rights exception*

The public rights exception is the second and related reason we conclude that the Seventh Amendment does not apply.

A.      *Public rights*

The Seventh Amendment guarantees that "[i]n [s]uits at common law, . . . the right of trial by jury shall be preserved." This right extends to a particular statutory claim if the action is "legal in nature." *Jarkesy*, 144 S. Ct. at 2128 (citing *Granfinanciera*, 492 U.S. at 53). It has been interpreted to require a jury trial in actions that are analogous to "[s]uits at common law" which were within the jurisdiction of late 18th-century English courts of law. *Tull v. United States*, 481 U.S. 412, 417 (1987).

Congress may assign the adjudication of public rights to an administrative agency absent a jury without violating the Seventh Amendment. *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). Public rights constitute actions that historically could have been determined by the executive and legislative branches alone, even where they were "presented in such form that the judicial power [wa]s capable of acting on them." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855).

But the Supreme Court has emphasized that Congress's power to avoid the application of the Seventh Amendment to a cause of action has limits. *Atlas Roofing*, 430 U.S. at 456. Congress cannot strip the parties of their constitutional right to a trial by jury in "traditional legal claims" involving private rights of action. *Granfinanciera*, 492 U.S. at 51–52. If a proceeding is in the nature of an action at common law, then it is presumed that the matter concerns private rights, requiring adjudication by a jury. *Stern v. Marshall*, 564 U.S. 462, 484 (2011). The substance of the action dictates whether the exception applies; the Seventh Amendment applies to novel statutory regimes if the actions are akin to common law claims. *Tull*, 481 U.S. at 421–23.

B.      *The Supreme Court's decision in* Jarkesy

The Supreme Court considered one such regime in *Jarkesy*. The Securities and Exchange Commission (SEC) initiated a civil fraud penalty action against Mr. Jarkesy for purported securities law

violations, including misrepresenting certain material facts and overvaluing investment funds' holdings to increase management and performance fees. *Jarkesy*, 144 S. Ct. at 2126. The SEC brought the civil penalty action before a designated administrative law judge serving as the factfinder. *Id.* at 2127. Mr. Jarkesy contended that the administrative adjudication of the civil fraud penalty with no opportunity for a jury trial violated the Seventh Amendment. *See id.*

The majority, concurrence, and dissent in *Jarkesy* all recognized the collection of revenue as a quintessential public right (meaning a right belonging to a sovereign, not a private citizen). *See id.* at 2132; *id.* at 2151 (Gorsuch, J., concurring); *id.* at 2164 (Sotomayor, J., dissenting). The majority noted several categories of cases that have been recognized previously as concerning public rights, including the collection of revenue.[9] *Id.* at 2132–33 (majority opinion). In fact, the majority used the government's historical power to collect revenue as a benchmark to describe the scope of the exception. *Id.* at 2132–34. And the concurrence observed that "public rights are a narrow class defined and limited by history. . . . [T]hat class has traditionally included the collection of revenue . . . ." *Id.* at 2146 (Gorsuch, J., concurring). The dissent agreed, repeatedly invoking the collection of revenue as the prototypical public right. *See id.* at 2159–60 (Sotomayor, J., dissenting).

C.     *Taxation as a public right*

Recognition of the collection of revenue as a public right long predates the Supreme Court's decision in *Jarkesy*. While 18th-century England did not have an income tax system, the government imposed a variety of levies and duties (e.g., land tax, internal excise taxes, customs duties, stamp and postal duties, etc.). 1 William Blackstone, *Commentaries on the Laws of England* 296–326 (1765). Broadly speaking, individuals could bring an action at common law challenging the assessment of a tax following its collection. These actions focused on the unlawful seizure of property to satisfy an assessment, and often were styled as writs of trespass or trover. *See, e.g.*, *Williams v. Pritchard* (1790) 100 Eng. Rep. 862 (KB) (trespass); *Eddington v. Borman* (1790)

---

[9] In applying *Jarkesy* recently, the U.S. Court of Appeals for the Fifth Circuit observed that while the public rights exception must be handled "with care," there are "'historic categories of adjudications' occurring outside Article III," including "revenue collection." *AT&T, Inc. v. FCC*, 135 F.4th 230, 238–39 (5th Cir. 2025) (quoting and citing *Jarkesy*, 144 S. Ct. at 2132–34).

100 Eng. Rep. 863 (KB) (trover); *Irving v. Wilson* (1791) 100 Eng. Rep. 1132, 1133 (KB) (money had and received).

Prepayment challenges to an assessment by contrast were not subject to judicial review. Instead, the disputes were administrative matters, resolved before a local commissioner or justice of the peace. *See* Land Tax Act 1692, 4 W. & M. c. 1, § VI (Eng. and Wales); *Patchett v. Bancroft* (1797) 101 Eng. Rep. 1024, 1025 (KB). Because no cognizable common law remedy was available for a prepayment challenge, there was no entitlement to a jury trial on the merits of the assessment.[10]

The American Revolution was spurred, in part, by the use of juryless admiralty courts to effect civil forfeitures for purported violations of import and maritime prize laws; thus, the scope of the right to a jury trial was considered during the ratification of the Constitution. *See* Matthew P. Harrington, *The Economic Origins of the Seventh Amendment*, 87 Iowa L. Rev. 145, 176–89 (2001). In The Federalist No. 83, Alexander Hamilton challenged the fears of antifederalists "that trial by jury is a safeguard against an oppressive exercise of the power of taxation," noting:

> This observation deserves to be canvassed.
> . . . .
> As to the mode of collection in [New York], under our own Constitution the trial by jury is in most cases out of use. The taxes are usually levied by the more summary proceeding of distress and sale, as in cases of rent. And it is acknowledged on all hands that this is essential to the efficacy of the revenue laws. The dilatory course of a trial at law to recover the taxes imposed on individuals would neither suit the exigencies of the public nor promote the convenience of the citizens.

The Federalist No. 83, at 499–500 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Article I of the Constitution expressly reserved the "Power To lay and collect Taxes, Duties, Imposts and Excises" to Congress. U.S. Const. art. I, § 8, cl. 1. It did not reserve a right to a jury trial in civil cases until

---

[10] We observe that this longstanding tradition is consistent with modern American tax procedure, as a taxpayer generally is entitled to a jury trial only in refund suits in district court. 28 U.S.C. § 2402.

the ratification of the Seventh Amendment, which guaranteed the right to a jury trial in "[s]uits at common law."

The typical late 18th-century revenue collection procedure "was nonjudicial and did not involve the courts at any stage from assessment to collection." Roger W. Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment*, 126 U. Pa. L. Rev. 1281, 1295 (1978). Early American jurisprudence further established the unique status of legal challenges to revenue collection.

The first Supreme Court decision addressing the public rights exception, *Murray's Lessee*, 59 U.S. (18 How.) at 282, in 1855, confirmed the federal government's power to rely on "summary methods" to collect unpaid taxes from revenue collectors. The Court recognized a certain class of cases involving public rights that were reserved to Congress's prerogative. And pursuant to its constitutional authority to lay and collect taxes, Congress could choose to extend Article III judicial review to these matters, but Congress "may regulate it and prescribe such rules of determination as they may think just and needful." *Id.* at 284.

D. *Revenue-related penalties*

The Center for Taxpayer Rights, as amicus curiae, contends that the same tradition of administrative collection does not exist for tax penalties. It urges that tax penalties "were imposed through suits at common law, with an Article III judge and jury." Our examination of the history suggests instead a stronger tradition of imposing tax penalties through administrative means.

1. *English tradition*

Parliament enacted forfeitures and penalties to buttress the collection of the various taxes discussed *supra* Part III.C. These acts generally provided for the assessment of penalties by local tax commissioners. *See, e.g.*, Land Tax Act 1692, 4 W. & M. c. 1, § XIII (Eng. and Wales). Justices of the peace (or commissioners) would then administratively adjudicate the merits of the penalty. *Id.*; Excise (No. 3) Act 1660, 12 Car. 2 c. 23, §§ XI, XVIII (Eng. and Wales). Some statutes granted concurrent jurisdiction to courts but still permitted the imposition and collection of penalties through administrative means. *See* Taxation (No. 3) Act 1756, 29 Geo. 2 c. 14, § XIII (Gr. Brit.). While other penalties from this era required collection by suit, those commonly resembled "informer statues," under which a private citizen could

prosecute the action and split the resulting proceeds with the Crown. *See* Sugar Act 1764, 4 Geo. 3 c. 15, § XL (Gr. Brit.); Navigation Act 1660, 12 Car. 2 c. 18, § XVIII (Eng. and Wales); *see also infra* Part III.D.2.

### 2. *American tradition*

Congress enacted several excise taxes in the late 18th century that provided for the collection of related penalties through suit. Like the English informer statute examples, these acts allowed private citizens and public officials alike to sue for penalties in the name of the United States. *See* Stamp Tax of 1797, ch. 11, § 20, 1 Stat. 527, 532; Carriage Tax of 1794, ch. 45, § 10, 1 Stat. 373, 375; Whiskey[11] Tax of 1791, ch. 15, §§ 42, 44, 1 Stat. 199, 209.[12] Individuals could step into the shoes of the sovereign via a qui tam[13] action and split any resulting proceeds with the government. *See, e.g.*, *United States v. Simms*, 5 U.S. (1 Cranch) 252, 258–59 (1803).

These examples only prove an already accepted principle—that qui tam penalties have a long common law tradition and are recognized as within the purview of Article III courts. *See Vt. Agency of Nat. Res.*, 529 U.S. at 776–78. But Congress's choice to channel these early tax penalties through traditional actions at common law (thereby triggering the Seventh Amendment) does not establish that all tax penalties must be collected in that manner.

The creation of the first federal income tax system ushered in a new era of tax penalties. An income tax was first instituted in 1861, but

---

[11] We use the common American spelling of the word here to refer to the tax and subsequent rebellion, rather than the original Scottish spelling, "whisky"; both are derived from "uisgebeatha," the Gaelic word for "water of life." *Whisky*, *Oxford English Dictionary* (2d ed. 1989); *see also Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 414 n.1 (6th Cir. 2012).

[12] These statutes either explicitly or implicitly allowed private citizens, or "informers," to sue for the collection of penalties. In reviewing the historical tradition of informer statutes, the Supreme Court has suggested, in dicta, that "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777 n.7 (2000) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943), *superseded by statute in part on other grounds as recognized in Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011)).

[13] Qui tam is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which translates to "who pursues this action on our Lord the King's behalf as well as his own." *Id.* at 768 n.1.

the Revenue Act of 1862, ch. 119, 12 Stat. 432, that followed created a progressive income tax system, established the predecessor to the IRS, and designed a system of direct federal tax administration and collection.[14] It also provided that all persons, partnerships, and corporations subject to the tax must "make a list or return" of all taxable income. *Id.* § 6, 12 Stat. at 434.

That Act introduced a 50% additional tax for failure to provide a return and a 5% penalty for late payment of taxes owed.[15] *Id.* §§ 11, 92, 12 Stat. at 435–36, 474. These, like the underlying tax liability, were assessed and collected administratively. *Id.* By 1864, Congress had subjected taxpayers furnishing negligent or fraudulent returns to 50% and 100% additions to tax, respectively. Revenue Act of 1864, ch. 173, § 14, 13 Stat. 223, 227. Three years later, these sanctions were described as a "penalty." Act of Mar. 2, 1867, ch. 169, § 13, 14 Stat. 471, 479. The name change did not alter how the sanctions were assessed and collected—i.e., administratively. *Id.*

### 3. Oceanic Steam Navigation Co. v. Stranahan

Against this backdrop, the Supreme Court weighed in—albeit about a different kind of penalty. In *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), it considered the imposition of penalties by a customs collector at a port of entry. After holding that matters concerning foreign commerce and immigration fell squarely within Congress's sphere of authority, the Supreme Court concluded:

> In accord with this settled judicial construction the legislation of Congress from the beginning, not only as to tariff *but as to internal revenue, taxation* and other subjects, has proceeded on the conception that it was within the competency of Congress, when legislating as to matters exclusively within its control, to impose appropriate obligations *and sanction their enforcement by reasonable money penalties*, *giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power.*

---

[14] For context, this Court was not established until 1924. Revenue Act of 1924, ch. 234, § 900, 43 Stat. 253, 336.

[15] The Revenue Act of 1862 § 9, 12 Stat. at 435, also introduced several *criminal* fraud penalties which were tried before an Article III court.

*Id.* at 339 (emphasis added).[16] The Court further noted:

> As the authority of Congress over the right to bring aliens into the United States *embraces every conceivable aspect of that subject*, it must follow that if Congress has deemed it necessary to impose particular restrictions on the coming in of aliens, *and to sanction such prohibitions by penalties enforcible by administrative authority*, it follows that the constitutional right of Congress to enact such legislation is the sole measure by which its validity is to be determined by the courts.

*Id.* at 340 (emphasis added).

Recognizing the problem caused by *Oceanic Steam*, the amicus attempts to distinguish immigration from tax penalties, contending that the "historical evidence specifically reveals that the government's authority to administratively collect taxes did not include authority to impose and collect tax penalties." We do not see the same distinction. Unlike the early excise tax penalties discussed *supra,* our federal income tax system has a lengthy tradition of administratively imposed and collected penalties.

### 4.    *History of section 6663(a)*

The Supreme Court also has held that the public rights exception applies to the predecessor of the modern section 6663(a) fraud penalty in *Helvering v. Mitchell*, 303 U.S. 391 (1938). It considered section 293 of the Revenue Act of 1928, ch. 852, § 293(b), 45 Stat. 791, 858, which provided, in part: "If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid . . . ." The Court viewed "sanctions imposing additions to a tax" as "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Helvering v. Mitchell*, 303 U.S. at 401. Concluding that section 293(b) was civil, it then held that "the determination of the facts upon which liability is based may be

---

[16] *Oceanic Steam* built upon a line of Supreme Court cases recognizing Congress's power to delegate to administrative agencies the authority to impose tariffs and duties, along with associated sanctions. *See Origet v. Hedden*, 155 U.S. 228 (1894); *Passavant v. United States*, 148 U.S. 214 (1893); *Bartlett v. Kane*, 57 U.S. (16 How.) 263 (1853).

by an administrative agency instead of a jury."[17] *Helvering v. Mitchell*, 303 U.S. at 402.

Section 6653(b) replaced section 293(b) in 1954. *See Stewart v. Commissioner*, 66 T.C. 54, 60–61 (1976) (describing section 293 as the predecessor to section 6653 and noting that the legislative history reveals no congressional intent to substantively modify the fraud penalty in 1954). In 1988 the magnitude of the section 6653(b) penalty was increased to 75%. *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 1015(b)(2)(B), 102 Stat. 3342, 3569.

Section 6663(a) replaced section 6653(b) in 1989, further modernizing the text: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." *See Feller v. Commissioner*, 135 T.C. 497, 507 (2010) ("Sections 6663 and 6664 replaced repealed section 6653."); *Clayton v. Commissioner*, 102 T.C. 632, 652–53 (1994) (observing that sections 6653 and 6663 require the same elements).

Even before section 6663(a) switched from "addition to tax" to "penalty," this Court frequently used the term "penalty" to refer to sections 293(b)[18] and 6653(b). *See, e.g., McKeon v. Commissioner*, 39 B.T.A. 813, 813 (1939) (discussing "a 50 percent fraud penalty under section 293(b) of the Revenue Act of 1928"); *Gordon v. Commissioner*, 63 T.C. 51, 52 (1974) (considering whether a "fraud penalty under section 6653(b)" applied), *supplemented by* 63 T.C. 501 (1975), *aff'd per curiam*, 572 F.2d 193 (9th Cir. 1977).

Regardless of the terminology, section 6663(a) contemplates the same conduct as its predecessors: an underpayment with fraudulent intent to evade taxes owed. Our prior cases analyzing section 293(b) (and 6653(b)) apply equally to section 6663(a). *See Montalbano v. Commissioner*, T.C. Memo. 2007-349, 2007 WL 4165258, at *3 n.3 (referring to section 293(b) as the predecessor to section 6663(a) and explaining that the omission of "'fraud with intent to evade tax' . . . . was not intended to alter the coverage of the statute"), *aff'd*, 307 F. App'x 322

---

[17] *Jarkesy* did not question the holding in *Mitchell*. *Jarkesy*, 144 S. Ct. at 2138; *id.* at 2161, 2165, 2167 (Sotomayor, J., dissenting); *see* Steve R. Johnson, *Jarkesy, The Seventh Amendment, and Tax Penalties*, 79 U. Miami L. Rev. 461, 504 (2025).

[18] In this context, we observe that formal "penalties" under the Revenue Act of 1928 § 146, 45 Stat. at 835, were criminal, not civil.

(11th Cir. 2009). We again conclude that the fraud penalty is "provided primarily as a safeguard for the protection of the revenue." *Sadler v. Commissioner*, 113 T.C. 99, 102 (1999) (citing *Helvering v. Mitchell*, 303 U.S. at 401).

IV.     *The nature of the statutory civil tax fraud penalty*

The Supreme Court has repeatedly recognized the collection of revenue and related penalties as a public right. It is the quintessential public right because revenue collection falls exclusively within the domain of a sovereign. And the statutory civil tax fraud penalty, like other civil tax penalties, is provided to safeguard the revenue and backstop our system of self-assessment.

Petitioner effectively argues that, following *Jarkesy*, any statutory penalty labeled "fraud" falls outside the public rights exception. This misconstrues the Supreme Court's jurisprudence. *Jarkesy* instructs us instead to consider whether the statutory civil tax fraud penalty resembles an action at common law traditionally reserved to jury trials. *Jarkesy*, 144 S. Ct. at 2138. *Compare Axalta Coating Sys. LLC v. FAA,* 144 F.4th 467, 476 (3d Cir. 2025) (applying *Jarkesy* to conclude that an aviation safety penalty action is a public right for Seventh Amendment purposes because it does not resemble an action at common law), *with Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, No. 23-2608, 2025 WL 2112927, at *5 (3d Cir. July 29, 2025) (applying the same to conclude that a penalty action relating to back wages owed to employees on visas is a private right because it resembles contract law).

The civil action in *Jarkesy* involved purported fraud upon private individuals, not the federal government. Even without the SEC enforcement action, a private litigant affected by securities fraud could pursue a fraud action against an investment manager for material misrepresentations. *See, e.g.*, *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 192 (5th Cir. 1979) (explaining plaintiff brought a private action under both theories of common law fraud and violations of federal securities law).

Statutory claims like those at issue in *Jarkesy* are modeled after causes of action traditionally available to private parties at common law. These simply are not comparable to section 6663(a), which contemplates

fraud upon the federal government.[19] A private litigant cannot pursue a statutory civil tax fraud penalty on behalf of the federal government; therefore, imposition and collection of this penalty falls squarely within the public rights exception. Because the Seventh Amendment is limited to suits at common law, not suits against the sovereign, it cannot enlarge the limited waiver of sovereign immunity that Congress authorized for challenges to these penalties.

We have considered all other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*

Reviewed by the Court.

URDA, *C.J.*, and KERRIGAN, BUCH, NEGA, ASHFORD, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ.*, agree with this opinion of the Court.

---

[19] Indeed section 6663(a) omits traditional elements of common law fraud, such as reliance or causation. *See Tershakovec v. Ford Motor Co.*, 79 F.4th 1299, 1306 (11th Cir. 2023).